## STATE OF CONNECTICUT *v.* SYDNEY SHINDELL
### (10951)

PETERS, C. J., PARSKEY, SHEA, DANNEHY and SANTANIELLO, Js.

Argued November 6, 1984—decision released January 29, 1985

*Ira B. Grudberg,* with whom were *Alice Miskimin* and, on the brief, *Karen F. Tross* and *Richard Emanuel,* for the appellant (defendant).

*Julia D. Dewey,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, *Mary Galvin,* assistant state's attorney, and *Anthony Chavez,* law student intern, for the appellee (state).

PARSKEY, J. The defendant, Sydney Shindell, was charged with two counts of arson in the second degree, in violation of General Statutes §§ 53a-112 (a) (1) (B) and (a) (2)[1] and 53a-8,[2] and two matching conspiracy counts, in violation of General Statutes § 53a-48.[3] The four counts related to two fires, one on November 23, 1974, and the other on November 29, 1974, both of which occurred at 36-38 Ann Street in New Haven. The jury returned verdicts of guilty on all four counts, and the defendant was sentenced to imprisonment for an effective term of not less than six nor more than fourteen years and was fined $10,000. The defendant appeals the judgment of conviction on four grounds, claiming error in the admission of evidence of other crimes and misconduct of the defendant; error in the exclusion of evidence and comment concerning the absence of an unavailable witness; improper restriction of the defendant's cross-examination of a witness; and erroneous jury instructions regarding accomplice testimony. We find no error.

The jury might reasonably have found the following facts: In October, 1973, the defendant, a landlord in

---

[1] At the time of the alleged crime, General Statutes § 53a-112 provided in relevant part: "(a) A person is guilty of arson in the second degree when he starts a fire or causes an explosion: (1) With intent to destroy or damage a building (A) of another, or (B) whether his own or another's, to collect insurance for such loss; and (2) such act subjects another person to a substantial risk of bodily injury or another building to a substantial risk of destruction or damage."

[2] "[General Statutes] Sec. 53a-8. CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[3] "[General Statutes] Sec. 53a-48. CONSPIRACY. RENUNCIATION. (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . ."

New Haven, met Peter Cappola through a real estate broker and sold him an apartment building at 24–36 Nash Street. The property was located in the Hill section of New Haven, which was at that time a depressed area of the city. Pleased with Cappola's management of the Nash Street building, the defendant wrote to him in December, 1973, offering to sell five additional properties, all located in the Hill area, as a package deal. On January 31, 1974, Cappola and the defendant closed the sale.

The terms of the sale agreement were as follows: The purchase price for the five properties, a complex of buildings located at Columbus Avenue and West Street, and separate buildings on Redfield Street, Cedar Street, Hallock Street and Ann Street, was $299,000. Cappola made a down payment of $12,500 and the defendant retained a mortgage interest of $286,500. The agreement also contained a "windfall profits clause" which provided that if any of the buildings were sold, taken by condemnation, or destroyed, the buyer and seller would share equally in any sale, condemnation or insurance proceeds in excess of the purchase price.

In June, 1974, there was an accidental fire at the Cedar Street property. Cappola called the defendant to notify him of the fire and, at the defendant's invitation, drove to his home with a copy of the insurance policy covering the Cedar Street building. The defendant was impressed with the extent of the policy's coverage in that it protected against vandalism and theft in addition to fire damage. The following morning, Cappola, the defendant and Edward Halprin, an appraiser who had worked for the defendant previously, inspected the Cedar Street property for damage.[4]

---

[4] There is nothing in the record to indicate that Edward Halprin was a party to the insurance fraud.

Dissatisfied with the extent of damage caused by the fire, the defendant directed Cappola to meet him at Cedar Street the next day and to bring with him one of his workers and a steel bar. Cappola arrived at the property accompanied by Scott Perrin, the superintendent of another building owned by Cappola, and the three men proceeded to destroy the building's interior. The defendant filed insurance claims for fire and vandalism damage to the Cedar Street property, engaging Edward Halprin as appraiser. The insurance company paid $58,190 on the claims. The defendant received approximately $29,000 of this sum as full payment on his mortgage, a portion of the award went to pay Halprin for his fee, and the remaining $28,000 was split between the defendant and Cappola, pursuant to the windfall profits clause.

During this same period, Cappola told the defendant that he was experiencing maintenance problems and finding it difficult to collect rents on the Columbus and West complex. The two decided that the complex should be burned to collect insurance, and Cappola told Perrin to set fire to the buildings. On June 30, 1974, the building at 438 Columbus Avenue burned. On August 22, 1974, Perrin set fire to 105 West Street at Cappola's request, after Cappola had raised the insurance coverage on the building from $60,000 to $90,000, as suggested by the defendant. The defendant handled the insurance claims on these fires, on which a total of approximately $125,000 was paid by the insurance company. Again, the insurance proceeds were first applied to pay the appraiser's fee and to satisfy the defendant's mortgage on the property, and the remaining sum was shared by Cappola and the defendant.

On September 11, 1974, with the defendant's encouragement, Cappola and Perrin brought containers of gasoline to 434 Columbus Avenue, planning to burn that building as well. This attempt was thwarted, how-

ever, when Perrin and Cappola encountered the police upon their arrival at the property. After a very brief period of questioning, the two men departed, no fire having been set.

In addition to filing insurance claims for fire damage to the buildings, the defendant and Cappola submitted false claims for vandalism, theft and loss of rents on the Hallock Street, Ann Street and the Columbus Avenue and West Street properties. To process these claims, the defendant contacted the appraiser, wrote up and typed the claim forms, and participated in providing statements to an independent insurance adjuster regarding the alleged vandalism losses.

On November 4, 1974, the insurance company cancelled the policies covering the properties sold by the defendant to Cappola. Two days later, Cappola applied for new coverage by a different insurance company on the Ann Street, Hallock Street and Cedar Street buildings through a new insurance agent. The agent issued binders, providing temporary insurance coverage pending the issuance of a policy by the company, that same day. By letter dated November 8, 1974, the defendant requested the agent to raise the amount of the binder's coverage on the Ann Street building from $97,000 to $112,000.

Because coverage under the binder was only effective for thirty days, Cappola and the defendant decided to arrange for a fire on Ann Street as soon as possible. Cappola hired Anthony Cordone, a plumber who had performed repairs on Cappola's properties, to set fire to the Ann Street building. With Cappola's aid and instruction, Cordone lit a fire at 36–38 Ann Street on November 23, 1974. A day or two later, Cappola told Cordone that he and the defendant had inspected the building and found that the damage was insufficient. The defendant sent his workmen to board up the Ann

Street building to hamper firefighting efforts, and Cordone set a second fire on the property on November 29, 1974. The second fire gutted the Ann Street building. The defendant mailed a notice of the loss to the insurance company the next day, and subsequently filed fire and vandalism claims with Edward Halprin's assistance. Upon the insurance company's failure to pay the claims, the defendant composed and mailed letters, signed by Cappola, to the state insurance department and the governor requesting an investigation of the delay in processing and settling the claims.

## I

The defendant claims that the trial court erred in admitting evidence of other crimes and misconduct in which he allegedly took part. He argues that evidence relating to arsons, attempted arson, vandalism and fraudulent insurance claims concerning properties other than 36–38 Ann Street amounted to an impermissible attack on his character in violation of his constitutional rights to due process and a fair trial. We disagree.

"Evidence of other misconduct, although not ordinarily admissible to prove the bad character or criminal tendencies of the accused, may be allowed for the purpose of proving many different things, such as intent, identity, malice, motive or a system of criminal activity"; *State* v. *Ibraimov,* 187 Conn. 348, 352, 446 A.2d 382 (1982); or an element of the crime charged. *State* v. *Falby,* 187 Conn. 6, 23, 444 A.2d 213 (1982). *State* v. *Braman,* 191 Conn. 670, 675–76, 469 A.2d 760 (1983). Still another use to which such evidence may be put is "[t]o prove the existence of a larger continuing plan, scheme, or conspiracy, of which the present crime on trial is a part. This will be relevant as showing motive, and hence the doing of the criminal act,

the identity of the actor, and his intention, where any of these is in dispute." McCormick, Evidence (2d Ed.) § 190, pp. 448-49.[5]

We have adopted a two-pronged analysis to determine the propriety of admitting evidence of other crimes or misconduct. "First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence." *State* v. *Braman,* supra, 676.

The trial court admitted evidence of other arsons, vandalism and false insurance claims as relevant to the defendant's motive, intent and involvement in a common plan or scheme. The defendant concedes that "evidence concerning the earlier fires, and attempted arson, at the Columbus and West complex might have been sufficiently similar to clear the initial relevancy hurdle." He argues, however, that the alleged instances of vandalism and false insurance claims had very little in common with the arsons for which the defendant was on trial, and that even the other arsons lacked the "requisite 'grade of similarity' " to make the proffered evidence admissible.

In so arguing, the defendant misconstrues the specific basis upon which the trial court admitted this evidence. The degree of similarity between the crime charged and the "other crime" is only at issue when the latter is an unrelated incident which, because of certain particularly distinguishing features that it shares in common

---

[5] In Lilly, An Introduction to the Law of Evidence § 45, p. 133, a pertinent hypothetical aptly illustrates the larger plan or scheme exception to the general prohibition against evidence of other crimes or misconduct: "In the prosecution of D for arson of building A, evidence that D had wrongfully burned building B would be relevant, if coupled with other evidence to show that D had a *plan* (scheme or design) to destroy these buildings in order to collect insurance proceeds." (Emphasis in original.)

with the charged offense, is probative to show that the same individual committed both. In such a case, the evidence is offered "[t]o prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. Here much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature." McCormick, supra, p. 449; see, e.g., *State* v. *Esposito,* 192 Conn. 166, 173–74, 471 A.2d 949 (1984); *State* v. *Nardini,* 187 Conn. 513, 519, 447 A.2d 396 (1982); *State* v. *Ibraimov,* supra, 354.

The "distinctive device" exception, however, was not the theory under which other crimes evidence was admitted in the case before us. Here, evidence of other arsons, vandalism and false insurance claims was admitted as probative of a common scheme to defraud insurance companies. The Ann Street fires were part of a larger plan that included the intentional destruction of property, by arson or vandalism, for profit, and the pressing of false claims for vandalism, theft and lost rents. These other offenses were not unrelated incidents that could only be connected to the charged crimes by showing a high degree of similarity in the modus operandi of their commission. As part of a continuing system of criminal activity, there were a substantial number of other factors that served to connect them.

All the various properties involved were part of a single sales transaction, a package deal executed under a common sales agreement and subject to nearly identical mortgage terms. Insurance proceeds collected on losses to any of the buildings were divided pursuant to the same windfall profits arrangement. Each of the key participants in the various offenses played a role that remained constant throughout: the defendant

advised Cappola, dealt directly with the appraiser, and filed and pressed the insurance claims; Cappola hired and instructed the actual perpetrators of the arsons and vandalism, set the scenes for the fires by strategically placing the gasoline in the buildings and signed the claims and letters prepared by the defendant. In addition, all the offenses occurred within less than a year, most within the space of six months. From all this, the trial court could reasonably conclude that the other crimes evidence was relevant and material to show "a larger continuing plan, scheme, or conspiracy, of which the present crime[s] on trial [were] a part." McCormick, supra, p. 448.

Our inquiry concerning the admissibility of other crimes evidence does not end with a determination of its relevancy, however. "Even though relevant and material evidence is offered in proof of an issue in such a case, the second prong of the analysis requires that 'the trial court must still consider whether its prejudicial tendency outweighs its probative value before ruling on its admissibility.' *State* v. *Ibraimov,* supra, 352. . . ." *State* v. *Braman,* supra, 681. The standard to be applied in reviewing such a ruling was recently articulated by this court. " 'Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . On review by this court, therefore, "every reasonable presumption should be given in favor of the trial court's ruling." *State* v. *Ryan,* [182 Conn. 335, 337, 438 A.2d 107 (1980)].' *State* v. *Howard,* [187 Conn. 681, 685, 447 A.2d 1167 (1982)]." *State* v. *Braman,* supra, 676–77. Here the trial court determined, in its discretion, that the probative value of this evidence was greater than its potential for prejudice. We cannot say as a matter of law that this determination constituted an abuse of judicial discretion.

The defense in this case was that the defendant was an innocent mortgagee who merely protected his substantial interest in the destroyed property. The defendant took the stand and denied any involvement in the arsons on Ann Street or the destruction of the other properties. Because of the way these offenses were committed, he could not be placed at the scene of the crimes or directly implicated in the Ann Street fires, save by the testimony of Cappola, a witness whose credibility was certainly questionable. Thus, evidence demonstrating a larger scheme of criminal activity in which the defendant was involved was highly probative of his participation in the Ann Street arsons.

The policy behind the exclusion of other crimes evidence is grounded in the concern that a jury will find the defendant guilty of the crime charged simply because he is a bad person, or under the rationale that someone who has committed a crime in the past is likely to do so again. "[E]vidence of other crimes, having no substantial relevancy except to ground the inference that [the] accused is a bad man and hence probably committed this crime, must be excluded." McCormick, supra, p. 453; *State* v. *Esposito,* supra, 169. In this case, however, the substantial connections between the other offenses and the crimes charged, probative of a continuing scheme of insurance fraud, established a strong ground of relevancy unrelated to a general attack on the defendant's character.

Finally, the trial court gave careful consideration to the issue of admissibility of other crimes evidence. Argument as to the general question of whether such evidence should be introduced was entertained, and the trial judge encouraged the defendant to continue to object during the course of trial so that each separate piece of evidence could be ruled on individually. In addition, the court properly instructed the jury that it could not find the defendant guilty of the crimes charged

because it believed him guilty of other crimes or misconduct, thereby minimizing the prejudicial effect of this evidence. *State* v. *Braman,* supra, 682. Under the circumstances of this case, the admission of evidence of other crimes and misconduct was not erroneous.

## II

Scott Perrin, an alleged participant in the vandalism of Cedar Street and the arsons and attempted arson at the Columbus and West complex, did not testify at trial. Although the prosecutor's office had granted him immunity and made repeated attempts to contact him, Perrin could not be located and hence the state was unable to compel his presence at trial. At the time of the trial, the defendant filed a motion to suppress Perrin's testimony in the event that he should appear. This motion was granted without prejudice to renewed objection by the state to the defendant's motion in the event that Perrin was found during the course of the trial. Later in the trial, when it was apparent that Perrin would not testify, defense counsel requested permission to present evidence of Perrin's unavailability and to comment on it in final argument. The parties stipulated that the state had attempted but failed to locate Perrin so that he was unavailable to testify. The trial court, however, denied the defendant's request to comment upon Perrin's absence to the jury. The defendant claims that this ruling constituted harmful error. We disagree.

"The failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause." *Ezzo* v. *Geremiah,* 107 Conn. 670, 677, 142 A. 461 (1928). "There are two requirements for the operation of the rule: The witness must be available, and he must be a witness whom the party would

naturally produce." *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960); *State* v. *Carrione,* 188 Conn. 681, 686, 453 A.2d 1137 (1982), cert. denied, 460 U.S. 1084, 103 S. Ct. 1775, 76 L. Ed. 2d 347 (1983). Since there is no question but that Perrin was not an available witness, no permissible inference of unfavorable testimony could be drawn from the fact of his absence under the settled law of this state.

The defendant concedes that he was not entitled to argue that the jury could infer Perrin's testimony would have been unfavorable to the state. He asserts, however, that he should have been permitted to comment on Perrin's absence, and to argue that Perrin was the only person who could have corroborated Cappola's testimony and that he had deliberately avoided process. We cannot see any distinction between the argument proposed by the defendant and the inference permitted under *Secondino* only upon a showing of the witness's availability. See *State* v. *Daniels,* 180 Conn. 101, 107–108, 429 A.2d 813 (1980) (similar comments in final argument considered under *Secondino* line of cases). The only conceivable purpose the defendant could have had in making such an argument would have been to lead the jury to infer that Perrin's testimony would have contradicted Cappola's. Since Cappola was the state's key witness, in essence this argument would have permitted an inference that the testimony of an unavailable witness would have been unfavorable to the state.

The fact that the defendant moved to suppress Perrin's testimony before his unavailability was disclosed indicates that he believed Perrin's testimony would damage his defense. The state'e efforts to procure Perrin's presence at trial support this belief. Since there is every indication that Perrin's testimony would

have strengthened the state's case, it was certainly not error for the trial court to have refused the defendant's request to suggest the opposite in final argument.

### III

The defendant claims that the trial court erred in restricting his cross-examination of Cappola in certain respects.[6] These restrictions, he argues, denied him effective impeachment of this witness in violation of his constitutional right of confrontation under the sixth amendment to the United States constitution. We do not agree.

"To comport with the constitutional standards embodied in the confrontation clause the defendant in exercising his right of cross-examination must be allowed to 'expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.' *Davis* v. *Alaska,* 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)." *State* v. *Wilson,* 188 Conn. 715, 720, 453 A.2d 765 (1982). Although cross-examination regarding motive, interest, bias and prejudice is a matter of right and may not be unduly restricted; *State* v. *Corley,* 177 Conn. 243, 246, 413 A.2d 826 (1979); *State* v. *Luzzi,* 147 Conn. 40, 46, 156 A.2d 505 (1959); we note that none of the rulings as to which the defendant assigns error involved questions of that nature.

In this case, the defendant's cross-examination of Cappola lasted four days and covered nearly six hun-

---

[6] The trial court sustained on relevancy grounds the state's objections to the defendant's cross-examination of Cappola concerning: (1) certain ingratiating comments that Cappola directed to the judge and the state's attorney during grand jury proceedings; (2) Cappola's alleged involvement in complicated business transactions unrelated to those at issue in the defendant's case; and (3) Cappola's failure to tape conversations with the defendant during the course of his undercover work for the New Haven police.

dred pages of trial transcript. To show lack of veracity and motive for testifying, the defendant elicited testimony that various criminal charges were pending against Cappola, including at least eight counts of perjury; that Cappola had testified for the state in other criminal prosecutions; and that Cappola understood that the sentencing judge assigned to his cases would be informed of his cooperation with the state. To refute the implication that the defendant was the mastermind of the insurance fraud scheme, Cappola was questioned as to his experience in the real estate business and his familiarity with insurance practices. The defendant repeatedly impeached Cappola's testimony with prior inconsistent statements made during a grand jury investigation, and questioned him extensively concerning the reasons for his perjuring himself at that investigation. Under these circumstances, we must conclude that the defendant was accorded ample opportunity to "expose to the jury the facts from which the jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Davis* v. *Alaska,* supra.

Since we have determined that the defendant's cross-examination of Cappola met with constitutional standards, we need only consider whether the trial court abused its discretion in restricting the scope of cross-examination. *State* v. *Gaynor,* 182 Conn. 501, 508, 438 A.2d 749 (1980). To demonstrate an abuse of discretion, the defendant must show that these restrictions were clearly prejudicial. Id. Because he has failed to meet this burden, we find no error.

## IV

Finally, the defendant claims error in the trial court's instruction to the jury concerning accomplice testi-

mony.[7] Although the defendant took no exception to that portion of the court's charge, he did file a request to charge in this regard. We do not agree with the defendant that the court's instruction on accomplice testimony was deficient.

The well settled rule in this state regarding the testimony of an accomplice is that "where it is warranted by the evidence, it is the *court's duty* to caution the jury to scrutinize carefully the testimony if the jury finds that the witness intentionally assisted in the commission, or if he assisted or aided or abetted in the commission, of the offense with which the defendant is charged." (Emphasis in original.) *State* v. *Ferrara,* 176 Conn. 508, 512, 408 A.2d 265 (1979); *State* v. *Colton,* 174 Conn. 135, 140, 384 A.2d 343 (1977). The defendant argues that the court's charge was erroneous because it predicated the jury's use of greater care in assessing such testimony upon a finding that the witness was motivated by the hope or expectation of leniency, rather than instructing the jurors to exercise

[7] The relevant portion of the trial court's charge is as follows: "Two of the witnesses in this case, Peter Cappola and Anthony Cordone, testified they participated in the crimes of which the defendant is accused. They are what is known in law as accomplices, and they are in a somewhat different position from other witnesses. Although it is not necessary that the testimony of an accomplice be corroborated by other testimony or evidence before you may accept it as true, you should weigh such testimony for its credibility, as I have already discussed, and you should consider that these witnesses are self-confessed criminals, and that if everything else were equal, you would not ordinarily believe the testimony of men who commit crimes, such as these crimes, as readily as you would believe the testimony of men of good character.

"If you find that their testimony was motivated by the hope or expectation of leniency by law enforcement officials or prosecuting authorities, whether or not that hope or expectation would be justified, then you should examine their testimony with greater care than the testimony of an ordinary witness. It is for you to determine whether their testimony was affected by any motive to testify in the hope or expectation of leniency for them. You should give such weight to their testimony as you deem appropriate under all of the circumstances."

particular scrutiny simply because the witness was an accomplice without regard to his motives for testifying.

Although a request to charge that is relevant to the case and accurately states the law must be honored, " 'a refusal to charge in the exact words of a request will not constitute error if the requested charge is given in substance.' *Mazzucco* v. *Krall Coal & Oil Co.,* 172 Conn. 355, 357, 374 A.2d 1047 (1977)." *State* v. *Cooper,* 182 Conn. 207, 211, 438 A.2d 418 (1980). This court has often repeated that " ' " '[a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case.' " ' " *State* v. *Estep,* 186 Conn. 648, 651, 443 A.2d 483 (1982); *State* v. *Harris,* 172 Conn. 223, 226, 374 A.2d 203 (1977); *Amato* v. *Desenti,* 117 Conn. 612, 617, 169 A. 611 (1933). In reviewing a challenge to a portion of the jury instructions, the proper test is "whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." *State* v. *Estep,* supra, 652.

In *State* v. *Colton,* supra, 141 n.1, the trial court's instruction on accomplice testimony was in substance identical to the charge in this case. There we held that because the court alerted the jury to the witness's "status as a self-confessed criminal and his possible interest in favorable treatment," the charge was adequate. We see no reason to depart from that standard in the case before us.

There is no error.

In this opinion the other judges concurred.