STATE OF CONNECTICUT *v.* GINO GENTILE
(AC 23064)

Foti, Dranginis and West, Js.

Argued November 18, 2002—officially released April 1, 2003

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Brian Preleski*, assistant state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. The defendant, Gino Gentile, appeals from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes

§ 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (1), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (1) and 53a-48 (a). On appeal, the defendant claims that (1) the trial court improperly permitted the state to introduce into evidence the cooperation agreement that the state had entered into with a witness, and permitted the state to question the witness about the agreement and to comment on it during closing argument, (2) the court improperly refused to charge the jury with his requested instruction about the credibility of accomplice testimony, (3) the court improperly refused to inquire into his complaints about his attorney and (4) there was insufficient evidence for the jury to have convicted him of conspiracy to commit robbery in the first degree. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of March 17, 1997, the defendant, along with Jorge Concepcion, Edgar DeJesus and several other individuals, congregated in a parking lot at a housing project on Corbin Street in New Britain. Members of the group were talking and smoking marijuana. During the conversation, an individual identified as "Anthony" said that he had earlier robbed the Fortune Chinese Restaurant with a BB gun. After several hours, the group dispersed, with the defendant, Concepcion and DeJesus leaving together. As the defendant, Concepcion and DeJesus walked toward a car, they joked about robbing the Fortune Chinese Restaurant. The defendant then removed a .380 caliber semiautomatic gun from his waistband, and the defendant, Concepcion and DeJesus decided to rob the restaurant. To conceal his identity, Concepcion went to a garbage dumpster to find something to cover his face. The defendant pulled out a ski mask that he already had in his possession. The defendant, Concepcion and DeJesus then

drove to a parking lot in the vicinity of the Fortune Chinese Restaurant.

Upon arriving at the parking lot, DeJesus remained in the vehicle, and the defendant and Concepcion walked toward the restaurant. After ensuring that there were no customers in the restaurant or police in the area, the defendant and Concepcion put on their masks, the defendant took out his gun and chambered a round, and they ran into the restaurant. The defendant told everyone to "hit the floor," and he jumped over the counter to get to the cash register. Once over the counter, the defendant demanded that the individual who was near the register open it and give him its contents. In the meantime, Concepcion entered the kitchen area, where there were two individuals. The defendant then went into the kitchen area with Concepcion. Concepcion demanded that one of the two, Ming Zhang, give him her purse, which she did. He then turned to leave the restaurant. The victim, San Chiu Wong, who also was in the kitchen area, lifted his head and the defendant fired a single round from his .380 caliber gun, striking the victim in the back of the head. The defendant then took the victim's wallet.

The defendant and Concepcion fled the restaurant and ran to the waiting vehicle. The defendant got behind the wheel and drove toward an arcade in Southington. During the drive, the defendant and Concepcion threw their masks and the wallets that they took from the victim and Zhang out the window. Upon arriving at the arcade, the defendant divided the money that was taken from the restaurant, and gave Concepcion and DeJesus a share.

On March 18, 1997, the victim died from the injuries he sustained from the gunshot wound the previous day. The defendant subsequently was arrested and, after a jury trial, was convicted and sentenced to a total effec-

tive term of 100 years imprisonment. This appeal followed.

## I

The defendant first claims that the court improperly permitted the state to introduce into evidence the cooperation agreement that the state entered into with Concepcion. Further, the defendant claims that the prosecutor's use of the cooperation agreement while questioning Concepcion on direct examination and during closing argument amounted to prosecutorial misconduct. We disagree.

The following facts are relevant to our resolution of that issue. Following Concepcion's arrest, he entered into a cooperation agreement with the state. According to the terms of the agreement, in return for Concepcion's full cooperation in the prosecution of any individual arrested in connection with the homicide and robbery that occurred at the Fortune Chinese Restaurant, the state agreed to permit Concepcion to enter a plea of guilty to robbery in the first degree for his involvement and to receive a sentence of no more than twenty years imprisonment.

At the defendant's trial, the state called Concepcion as a witness. After the state laid a foundation for the admission of the cooperation agreement, the court admitted the agreement into evidence as a full exhibit after the defendant stated that he did not object. The state then read the document to the jury and proceeded to question Concepcion about the events that transpired on March 17, 1997. On cross-examination, the defendant also questioned Concepcion regarding the events of March 17, 1997, and as to his motivation for entering into the cooperation agreement.[1] On redirect examina-

___

[1] The following colloquy, in relevant part, took place between counsel for the defendant and Concepcion:

"[Defense Counsel]: Well, you've stated that no promises were made to you, but you received some beneficial treatment as a result of your testimony already, have you not?

tion, the state asked Concepcion about the conse-
quences that he faced if he did not abide by the terms
of the cooperation agreement.[2] Additionally, during

"[The Witness]: Yes.

\* \* \*

"[Defense Counsel]: [P]lus you've been told through the offices of your
attorney that if you cooperate, good things will happen for you. Is that
correct?

"[The Witness]: Yes.

"[Defense Counsel]: In fact, goods things have already happened, if I recall
when you read this agreement, which you just signed in the past week or
so. Is that correct?

"[The Witness]: Yes.

\* \* \*

"[Defense Counsel]: And you still insist that what's motivating you here
is truth, not your own self-interest about your sentence now?

"[The Witness]: Well, both.

"[Defense Counsel]: So, you expect some—you've already received some
consideration, and you expect even more. Is that correct?

"[The Witness]: Yes."

[2] The following colloquy, in relevant part, took place between the prosecu-
tor and Concepcion:

"[Prosecutor]: And by the terms of [the cooperation agreement,] you
understand that if you testify untruthfully, you'll face that felony murder
charge?

"[The Witness]: Yes.

"[Prosecutor]: And with respect to that agreement, your obligation under
the agreement is to tell the truth, correct?

"[The Witness]: Yes.

\* \* \*

"[Prosecutor]: If you don't tell the truth, I can prosecute you for a fel-
ony murder?

"[The Witness]: Yes.

"[Prosecutor]: And if you do tell the truth, then what we anticipate is that
you're willing to be found guilty of robbery in the first degree?

"[The Witness]: Yes.

"[Prosecutor]: And you face a sentence of up to twenty years, correct?

"[The Witness]: Yes. . . .

"[Prosecutor]: Okay. And with respect to the reason you're cooperating,
that you decided to tell the truth, and it's also so that you're not standing
here, and you're sitting in [the defendant's] seat facing a felony murder
charge, correct?

"[The Witness]: Yes.

\* \* \*

"[Prosecutor]: And with respect to the cooperation agreement, we signed
that cooperation agreement just, I don't know, about a week ago, February

closing argument, both the state[3] and the defendant[4] commented on the cooperation agreement that the state had entered into with Concepcion.

On appeal, the defendant contests the court's decision to admit the cooperation agreement into evidence and the state's subsequent use of the agreement during the examination of Concepcion and closing argument. Specifically, the defendant contends that the admission

---

1, I think.

"[The Witness]: Yes.

"[Prosecutor]: And that was in my office, and you and your attorney were present and we had some witnesses there?

"[The Witness]: Yes.

"[Prosecutor]: And have you told the truth today about what transpired here?

"[The Witness]: Yes.

"[Prosecutor]: And you realize that, should I come to find out that you didn't tell the truth, you're going to be the guy in [the defendant's chair] next, right?

"[The Witness]: Yes."

[3] In closing argument, the prosecutor stated in relevant part: "[T]he theory of the state's case and the basis upon which it is tried, and in fact as you read in the cooperation agreement, one of the reasons why Mr. Concepcion received a cooperation agreement is that [the defendant] is the shooter. He is the person who killed [the victim]. . . . You can take [the fact that the state entered into a cooperation agreement with Concepcion] into consideration, the fact that [Concepcion] received the benefit of a cooperation agreement in evaluating his testimony. . . . [Y]ou're going to have the cooperation agreement . . . and you'll be able to read that for yourselves. The cooperation agreement requires specifically that Mr. Concepcion be completely truthful in his testimony. In the event that he's not completely truthful in the testimony, the cooperation agreement is void by its terms, and Mr. Concepcion will come back here and be sitting in [the defendant's] chair, facing felony murder charges just as [the defendant] is today. That is strong incentive for Mr. Concepcion to tell the truth."

[4] In the defendant's closing argument, counsel stated in relevant part: "Jorge Concepcion testified he was motivated by truth in testifying against [the defendant]. In a written cooperation agreement with the state providing for reduction of his charges from felony murder, robbery one and conspiracy to commit robbery one only. Concepcion has been incarcerated since March 4, 1998, on this matter, and despite the agreement, nothing concrete has occurred. His file is being kept open and active to ensure that he remains motivated, and this may influence his actual production of testimony here at trial."

of the agreement into evidence and the state's use of the agreement during its examination of a witness and during closing argument served to bolster Concepcion's testimony improperly by placing the prosecutor's "stamp of approval" on it. We will address each of the defendant's claims in turn.

## A

The defendant did not preserve his claim that the court improperly admitted into evidence the cooperation agreement entered into by the state and Concepcion and now seeks review under *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and the plain error doctrine. See Practice Book § 60-5. In the alternative, the defendant asks us to invoke our supervisory powers to review his claim.

Under *Golding,* "[a] defendant can prevail on [an unpreserved] claim of constitutional error . . . only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; internal quotation marks omitted.) *State* v. *O'Neil,* 261 Conn. 49, 58–59, 801 A.2d 730 (2002).

In this case, the defendant, when asked by the state if he objected to the introduction of the cooperation agreement, stated that he did not, nor did the defendant object when the state mentioned the cooperation

agreement during its closing argument. Additionally, the defendant used the cooperation agreement during his cross-examination of Concepcion and commented on it during his closing argument.[5]

The defendant has failed to satisfy the second prong of *Golding* because his claim is not of constitutional magnitude. "In essence, the defendant attempts to put a constitutional tag on a nonconstiutional evidentiary ruling. . . . We previously have stated that the admissibility of evidence is a matter of state law and unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved. . . . The [error] claimed by the defendant in the present case [is] simply evidentiary in nature." (Citations omitted; internal quotation marks omitted.) *State* v. *Toccaline*, 258 Conn. 542, 550, 783 A.2d 450 (2001). The court's admission of the cooperation agreement without objection from the defendant did not implicate a constitutional right or result in a fundamentally unfair trial. See id., 551. Accordingly, because the defendant's claim is not of constitutional magnitude, we decline to review the claim under *Golding*.

We next consider whether the defendant can prevail under our plain error doctrine. "Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Corona*, 69 Conn. App. 267, 273–74, 794 A.2d 565, cert. denied, 260 Conn. 935, 802 A.2d 88 (2002).

"[The] Plain Error Rule may only be invoked in instances of forfeited-but-reversible error . . . and cannot be used for the purpose of revoking an otherwise valid waiver. This is so because if there has been a valid

---

[5] See footnotes 1 and 4.

waiver, there is no error for us to correct." (Internal quotation marks omitted.) Id., 274. Accordingly, because the defendant waived any objection he may have had by affirmatively stating that he did not object to the admission into evidence of the cooperation agreement, this is an inappropriate case for us to review his claim under the plain error doctrine. See id., 274–75.

Finally, we decline to invoke our supervisory powers to review the defendant's claim. "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reasons which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . [O]ur supervisory authority [however] is not a form of free-floating justice, untethered to legal principle. . . . Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . [O]ur supervisory powers are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts . . . ." (Internal quotation marks omitted.) *State* v. *Ashe*, 74 Conn. App. 511, 526, 812 A.2d 194, cert. denied, 262 Conn. 949, 817 A.2d 108 (2003). We see no reason to exercise our supervisory powers to review the defendant's claim as to the admissibility of the cooperation agreement because he waived any objection at trial and then used the agreement during his cross-examination of Concepcion and closing argument.

B

The defendant next claims that the state's use of the cooperation agreement during its examination of Concepcion and in its closing argument bolstered Con-

cepcion's testimony, and that this amounted to prosecutorial misconduct. We disagree.

The defendant concedes that he did not preserve his claim at trial and, once again, seeks review under *State v. Golding*, supra, 213 Conn. 239–40. We will review the claim under *Golding* because the record is adequate for our review and because an allegation of prosecutorial misconduct in violation of a fundamental right is of constitutional magnitude. *State v. Santiago*, 73 Conn. App. 205, 212, 807 A.2d 1048 (2002), cert. granted on other grounds, 262 Conn. 939, 815 A.2d 673 (2003).

"The standard of review for a claim of prosecutorial misconduct is well established. [T]o deprive a defendant of his constitutional right to a fair trial . . . the prosecutor's conduct must have so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. . . .

"[T]o determine whether claims of prosecutorial misconduct amount to a denial of due process, we must decide whether the challenged remarks were improper, and, if so, whether they caused substantial prejudice to the defendant. . . . In conducting our analysis, we focus on several factors: (1) the extent to which the misconduct was invited by defense conduct or argument; (2) the severity of the conduct; (3) the frequency of the conduct; (4) the centrality of the misconduct to the critical issues of the case; (5) the strength of the curative instructions adopted; and (6) the strength of the state's case." (Citation omitted; internal quotation marks omitted.) *State v. Beverly*, 72 Conn. App. 91,

96, 805 A.2d 95, cert. denied, 262 Conn. 910, 810 A.2d 275 (2002).

The crux of the defendant's claim of prosecutorial misconduct stems from the prosecutor's use on direct and redirect examination and during closing argument of the cooperation agreement that the state had entered into with Concepcion. It is the defendant's contention that we should adopt the view held by the United States Court of Appeals for the Second Circuit, which held that a prosecutor could not introduce a cooperation agreement into evidence until after the witness' credibility had been attacked. *United States* v. *Cosentino*, 844 F.2d 30, 34 (2d Cir.), cert. denied, 488 U.S. 923, 109 S. Ct. 303, 102 L. Ed. 2d 322 (1988). According to the defendant, it was prosecutorial misconduct for the prosecutor to question Concepcion about the cooperation agreement that he entered into with the state. We disagree.

The rule adopted by the Second Circuit precluding the introduction into evidence of a cooperation agreement until after a witness' credibility has been attacked is based on the view that "when introduced by the Government, [the cooperation agreement] is used primarily to bolster the credibility of a witness." (Internal quotation marks omitted.) *United States* v. *Borello*, 766 F.2d 46, 57 (2d Cir. 1985). The Second Circuit's view, however, is the minority view among the federal circuit courts of appeal. Currently, only the Ninth and Eleventh Circuits follow the Second Circuit's holding restricting the admission into evidence of a cooperation agreement until after a witness' credibility has been attacked. See *United States* v. *Necoechea*, 986 F.2d 1273, 1277 (9th Cir. 1993); *United States* v. *Knowles*, 66 F.3d 1146, 1161–62 (11th Cir. 1995), cert. denied sub nom. *Wright* v. *United States*, 517 U.S. 1149, 116 S. Ct. 1449, 134 L. Ed. 2d 568 (1996).

The overwhelming majority view among the circuits is that it is not improper bolstering for a prosecutor to question a witness on direct examination about the cooperation agreement's requirement that the witness testify truthfully to receive the benefits of the agreement. See *United States* v. *Weston*, 960 F.2d 212, 215–16 (1st Cir. 1992); *United States* v. *Oxman*, 740 F.2d 1298, 1302–1303 (3d Cir. 1984), vacated and remanded on other grounds sub nom. *United States* v. *Pflaumer*, 473 U.S. 922, 105 S. Ct. 3550, 87 L. Ed. 2d 673 (1985); *United States* v. *Henderson*, 717 F.2d 135, 137–38 (4th Cir. 1983), cert. denied, 465 U.S. 1009, 104 S. Ct. 1006, 79 L. Ed. 2d 238 (1984); *United States* v. *Binker*, 795 F.2d 1218, 1223 (5th Cir. 1986), cert. denied, 479 U.S. 1085, 107 S. Ct. 1287, 94 L. Ed. 2d 144 (1987); *United States* v. *Tocco*, 200 F.3d 401, 416–17 (6th Cir. 2000); *United States* v. *Anderson*, 303 F.3d 847, 856 (7th Cir. 2002); *United States* v. *Santana*, 150 F.3d 860, 863 (8th Cir. 1998); *United States* v. *Lord*, 907 F.2d 1028, 1030–31 (10th Cir. 1990); *United States* v. *Spriggs*, 996 F.2d 320, 323–24 (D.C. Cir.), cert. denied, 510 U.S. 938, 114 S. Ct. 359, 126 L. Ed. 2d 323 (1993).

The majority of the circuits reject the Second Circuit's view that when a cooperation agreement is used by the government, it serves primarily to bolster the witness' credibility. Rather, the majority of circuits recognize the dual nature of cooperation agreements—both impeaching and bolstering a witness' credibility. Cooperation agreements can undermine a witness' credibility by revealing a motive for the witness to tailor his testimony to satisfy the government to receive the benefits of the agreement while at the same time the witness' credibility can be bolstered by the presence of a cooperation agreement that can give the witness' testimony the appearance of having the government's stamp of approval. *United States* v. *Henderson*, supra, 717 F.2d 137; *United States* v. *Spriggs*, supra, 996 F.2d 324;

*United States* v. *Lord,* supra, 907 F.2d 1030–31. Furthermore, we note that the Second Circuit has acknowledged that its view is in the minority and that if it were not bound by precedent, it might have adopted the position of the majority of the circuits. *United States* v. *Cosentino,* supra, 844 F.2d 33 n.1.

We think that the view adopted by the majority of the circuits is the better approach. Accordingly, we hold that it was not improper for the prosecutor to question Concepcion about the cooperation agreement that he entered into with the state.

The defendant further claims that the prosecutor's comments during closing argument concerning the cooperation agreement amounted to prosecutorial misconduct in that he improperly vouched for Concepcion's credibility. See footnote 3. We disagree.

"[P]rosecutorial misconduct can occur in the course of closing argument. . . . When presenting closing arguments, as in all facets of a criminal trial, the prosecutor, as a representative of the state, has a duty of fairness that exceeds that of other advocates. . . . Nevertheless, [i]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered . . . . Ultimately, therefore, the proper scope of closing argument lies within the sound discretion of the trial court. . . .

"We do not scrutinize each individual comment in a vacuum, but rather we must review the comments complained of in the context of the entire trial. . . . It is in that context that the burden [falls] on the defendant to demonstrate that the remarks were so prejudicial that

he was deprived of a fair trial and the entire proceedings were tainted." (Citations omitted; internal quotation marks omitted.) *State* v. *Rogelstad,* 73 Conn. App. 17, 27, 806 A.2d 1089 (2002).

"A statement within closing argument is blatantly egregious as to implicate the fundamental fairness of the trial itself where in light of all of the facts and circumstances . . . no curative instruction could reasonably be expected to remove [its] prejudicial impact. . . . In reviewing a claim of prosecutorial misconduct during closing argument, we ask whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Citation omitted; internal quotation marks omitted.) *State* v. *Wickes,* 72 Conn. App. 380, 385, 805 A.2d 142, cert. denied, 262 Conn. 914, 811 A.2d 1294 (2002).

The defendant claims that the prosecutor improperly bolstered the testimony of Concepcion when he stated: "[A]s you read in the cooperation agreement, one of the reasons why Mr. Concepcion received a cooperation agreement, one of the reasons why Mr. Concepcion received a cooperation agreement is that [the defendant] is the shooter. He is the person who killed the man" and that "[t]he cooperation agreement requires specifically that Mr. Concepcion be completely truthful in his testimony. In the event he's not completely truthful in his testimony, the cooperation agreement is void by its terms, and Mr. Concepcion will come back here and be sitting in [the defendant's] chair, facing felony murder charges just as [the defendant] is today. That is strong incentive for Mr. Concepcion to tell the truth."

Our review of the record does not disclose conduct that was "so egregious that it infringed on the defendant's right to a fair trial." *State* v. *Rogelstad,* supra, 73 Conn. App. 33. At no point did the prosecutor personally vouch for Concepcion's credibility. Rather, the defen-

dant challenges the prosecutor's comments that relate to what would occur if Concepcion violated the terms of the cooperation agreement. Further, "[w]e also find it significant that the defendant failed to object to any of the prosecutor's remarks at trial. *State* v. *Denson*, 67 Conn. App. 803, 815, 789 A.2d 1075 (failure to object to allegedly improper argument often indicates that counsel did not view the remarks as so prejudicial that his client's right to a fair trial was seriously jeopardized), cert. denied, 260 Conn. 915, 797 A.2d 514 (2002)." *State* v. *Morgan*, 70 Conn. App. 255, 286, 797 A.2d 616, cert. denied, 261 Conn. 919, 806 A.2d 1056 (2002).

The comments made by the prosecutor merely alluded to what would happen to Concepcion if he did not fulfill his obligations under the cooperation agreement, all of which was evidence brought out during the examination and cross-examination of him C during the trial. See *Lam* v. *Kelchner*, 304 F.3d 256, 272–73 (3d Cir. 2002); *United States* v. *Anderson*, supra, 303 F.3d 855–56. We conclude, therefore, that the defendant has failed to demonstrate that he was deprived of a fair trial. Accordingly, the defendant has failed to satisfy the third prong of *Golding*.

## II

The defendant next claims that the court improperly refused to give the jury his requested instruction about the credibility of an accomplice.[6] We disagree.

"Generally, a defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely.

---

[6] "In his principal brief, the defendant invoked both the United States constitution and the constitution of Connecticut. Because he has not provided a separate and distinct analysis of his claim under the state constitution, we address only his federal constitutional claim." *State* v. *McColl*, 74 Conn. App. 545, 558 n.11, 813 A.2d 107 (2003), cert. denied, 262 Conn. 953, 818 A.2d 782 (2003).

. . . There are, however, two exceptions to this rule: the complaining witness exception and the accomplice exception." (Citation omitted.) *State* v. *Ortiz*, 252 Conn. 533, 561, 747 A.2d 487 (2000). "In *State* v. *Shindell*, 195 Conn. 128, 486 A.2d 637 (1985), [our Supreme Court] articulated the rule regarding instructions involving accomplice witnesses. [The court] held that where it is warranted by the evidence, it is the court's duty to caution the jury to scrutinize carefully the testimony if the jury finds that the witness intentionally assisted in the commission, or if he assisted or aided or abetted in the commission, of the offense with which the defendant is charged." (Internal quotation marks omitted.) *State* v. *Ortiz*, supra, 562. "The court's duty to so charge is implicated only where the trial court has before it sufficient evidence to make a determination that there is evidence that the witness was in fact an accomplice." (Internal quotation marks omitted.) *State* v. *Stevenson*, 53 Conn. App. 551, 575–76, 733 A.2d 253, cert. denied, 250 Conn. 917, 734 A.2d 990 (1999).

"In reviewing a constitutional challenge to the trial court's instructions, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . The test is whether the charge as a whole presents the case to the jury so that no injustice will result. . . . We will reverse a conviction only if, in the context of the whole, there is a reasonable possibility that the jury was misled in reaching its verdict. . . .

"A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present. . . . An instruction that fails to satisfy these requirements would violate the defendant's right to due process of law as guaranteed by the fourteenth amendment to the United States constitution

and article first, § 8, of the Connecticut constitution.
. . .

"The test of a charge is whether it is correct in law, adapted to the issues and sufficient for the guidance of the jury . . . . The primary purpose of the charge is to assist the jury in applying the law correctly to the facts which they might find to be established. . . . The purpose of a charge is to call the attention of the members of the jury, unfamiliar with legal distinctions, to whatever is necessary and proper to guide them to a right decision in a particular case. . . . It is the law of this state that a request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given. . . . It is, however, also the law of this state that a refusal to charge in the exact words of a request will not constitute error if the requested charge is given in substance." (Citation omitted; internal quotation marks omitted.) *State* v. *Sanchez*, 50 Conn. App. 145, 153–54, 718 A.2d 52, cert. denied, 247 Conn. 922, 722 A.2d 811 (1998).

The defendant requested the court to instruct the jury to "carefully scrutinize" Concepcion's testimony because of his involvement in the events that occurred on March 17, 1997, and the statements that he gave to the police after his arrest. His requested charge, however, did not specifically seek an accomplice charge. Rather, the defendant sought to have the court instruct the jury to consider Concepcion's motive in testifying and any potential bias or prejudice that he might have against the defendant.

When the court instructed the jury, it did not give the exact charge that the defendant requested.[7] After

_____

[7] The court charged the jury on the credibility of witnesses as follows: "Now, also, in this case, we have had a number of witnesses, and I will tell you the law concerning the credibility and how to decide in your own mind which of these witnesses is telling the truth. Now, *credibility of witnesses is that believability and the weight to be given to their testimony, which are matters which are within your function.* Now, we offer you some sug-

the jury was charged, the defendant took exception to

gestions.

"Now, no fact, of course, is to be determined merely by the number of witnesses testifying for or against it. It is the quality and not the quantity of the testimony, which should be controlling. In weighing the testimony of a witness, you should consider his or her appearance on the witness stand. In other words, you should try and size the witness up. You should have in mind all of the little circumstances which point to the witness' truthfulness or untruthfulness. *You should consider any possible bias or prejudice that the witness may have, whether for or against the state, for or against the accused, interest or lack of interest of whatever sort in the outcome of the trial,* or the witness' ability to observe the facts correctly and to remember and relate them truthfully and accurately. You should test the evidence the witness gives you by your own knowledge of human nature, and the motives which influence and control human nature.

"If any facts are admitted or otherwise proven to you, you may well bring these into relationship with the testimony and see if they fit together. You are to bring to bear upon the testimony the same considerations and use the same sound judgment that you apply to questions of truth and veracity, which are daily presenting themselves for your consideration in the ordinary affairs of life. *The credibility you will give the testimony offered by various witnesses is something which you must determine.* That is, whether any witness testified inaccurately, and if you do not think that the inaccuracy was consciously dishonest, you should bear that in mind and scrutinize the whole testimony of that witness.

"Thus, if you find that there has been an inaccuracy in one respect on the part of the witness, remember in giving it judgment upon the rest of the witness' testimony. Giving the same weight in your mind which leads you to think that it ought to have in which you attach to it in the ordinary affairs of life of anyone coming to you in a matter and you found that in some particular aspect that person was inaccurate. Now, if, however, you conclude that the witness was testifying intentionally untruthfully, that casts a very serious doubt upon all of the witness' testimony, and you might well conclude that you cannot accept any of it. [That] fact, however, is a matter for you to determine.

"Now, even though you find that a witness intentionally gives false testimony as to certain matters, you may find that in certain other matters that the witness' testimony is worthy of acceptance by yourselves. *After all, whether you should believe all of the witness' testimony, some portion of it or none of it, that is for you to decide. You may want to ask yourself in passing upon the credibility of any witness whether that witness has any bias or prejudice [as] regards any party to the action or, if so, whether that witness has permitted that bias or prejudice to color the witness' testimony.* Well, of course, [it does] not follow merely by the fact that a witness does have a bias or prejudice or does have some interest in the outcome of the case that the witness' testimony is to be disbelieved. There

the charge given in respect to how the jury should scrutinize Concepcion's testimony. The court, in refusing to give the defendant's proposed charge verbatim, stated that the charge it gave was similar to the one that the defendant requested, and "the request of charge [that the defendant] gave [to the court] was too involved in making [the court] make statements as to the evidence. And I think it was sufficient what I said as to intent, interests, and I specifically mentioned Mr. Concepcion in the charge."

Although the court did not specifically charge the jury as the defendant requested on the credibility of accomplice testimony, we are unpersuaded by the defendant's claim that the charge that the court gave the jury "deprived him of his right to a fair adjudication of his defense and to an adequately instructed jury." The charge that the court gave, when read as a whole, adequately informed the jury that it was to scrutinize Concepcion's testimony because of his motive in testifying and any potential bias or prejudice that he may have toward the defendant. Accordingly, the court substantially complied with the defendant's requested

are many, who no matter what their interest in the outcome of the case might be, [who] would not testify falsely.

"*On the other hand, the jury should always bear in mind that if a witness has a decided bias or prejudice or has an interest in the outcome of the case, that bias or interest offers something of a temptation to sway or shade the witness' testimony as a result of it.* You may properly apply to the testing of the testimony of any witness, your knowledge of human nature and the motives which influence and control human action. Number one, you have a right to bring to bear upon the testimony in court the same tests of veracity which would be used in the everyday affairs of life. *You are to use you own sound judgment to choose what testimony you will believe and to disregard in all or in part any testimony.*

"*Now, in this particular case, we had witnesses who may have an interest or whatnot. I'm, looking at Mr. Concepcion and you heard [the prosecutor] talk to him about a stipulation that he has entered into. So, all of these things fit into what I'm trying to tell you as to what interest and the outcome of this particular case as vis-a-vis people's ability to testify accurately.*" (Emphasis added.)

instruction, and the charge given was not improper. See id., 158–59; *State* v. *Siano*, 20 Conn. App. 369, 379, 567 A.2d 1231 (1989), aff'd, 216 Conn. 273, 579 A.2d 79 (1990).

## III

The defendant next claims that the court inadequately addressed his complaint about his attorney. We disagree.

The following facts are relevant to our resolution of that issue. Prior to the state's calling its last witness, the defendant, outside of the jury's presence, asked the court if he could say something. The court declined the request, stating that if the defendant wanted to talk, it had to be through his attorney. The defendant, in response, stated: "I don't feel he's representing me properly." The court responded that it thought his attorney was doing a good job. The defendant then stated that he also had made that same statement previously.[8] The court then took a lunch recess. When court resumed, the defendant did not renew his complaint.

"Where a defendant voices a seemingly substantial complaint about counsel, the court should inquire into the reasons for dissatisfaction. . . . If [t]he defendant's eruptions at trial, however, fell short of a seemingly substantial complaint, we have held that the trial court need not inquire into the reasons underlying the defendant's dissatisfaction with his attorney. . . . The extent of an inquiry into a complaint concerning defense counsel lies within the discretion of the trial court. . . . Moreover, the defendant's right to be represented by

---

[8] In his brief, the defendant does not indicate where or when he made a prior complaint to the court. The state, in its brief, stated that the defendant's reference to an earlier complaint occurred when the court was canvassing the defendant as to his waiving of the sixty day requirement for a probable cause hearing. In his reply brief, however, the defendant states that there is no indication in the record as to what he was referring.

counsel does not grant a defendant an unlimited opportunity to obtain alternate counsel on the eve of trial . . . and may not be used to achieve delay in the absence of exceptional circumstances. . . . The appellate scrutiny of the trial court's inquiry into complaints concerning adequacy of counsel must be tempered by the timing of such complaints." (Citations omitted; internal quotation marks omitted.) *State* v. *Robinson*, 227 Conn. 711, 725, 631 A.2d 288 (1993).

"[W]e note that we look with a jaundiced eye at complaints regarding adequacy of counsel made on the eve of trial, or during the trial itself. . . . In order to work a delay by a last minute discharge of counsel there must exist exceptional circumstances." (Internal quotation marks omitted.) Id., 726.

"[T]he trial judge is in the best position to evaluate the myriad and often subtle factors upon which the exercise of such discretion depends. In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *State* v. *Mejia*, 233 Conn. 215, 239, 658 A.2d 571 (1995).

As previously stated, our scrutiny of the court's inquiry is "tempered by the timing of such complaints." *State* v. *Robinson*, supra, 227 Conn. 725. In this case, the defendant's complaint came prior to the state calling its last witness. After the court ruled on the defendant's complaint, the defendant did not raise the issue again. At sentencing, when asked by the court if he had anything to say, the defendant only stated: "I would like to say that I'm sorry for what happened, but I didn't shoot anybody. That's all I could say." The court observed the trial, and was in a position to determine

whether the defendant's counsel was representing him properly and found that counsel was "doing a good job." Accordingly, the court did not abuse its discretion when it addressed the defendant's complaint as to the adequacy of counsel.

IV

The defendant's last claim is that there was insufficient evidence to uphold his conviction of conspiracy to commit robbery in the first degree. Specifically, the defendant contends that there was no evidence introduced at his trial that he "agreed with others to cause serious physical injury to anyone during the robbery." Rather, the defendant claims that the injuries that were sustained by the victim were unplanned. We disagree.

The defendant did not raise his claim before the trial court and now seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. "Our Supreme Court, following the dictate of the United States Supreme Court in *Jackson* v. *Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), has held that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*. Accordingly, we conclude that no practical reason exists to engage in a *Golding* analysis of a sufficiency of the evidence claim and, thus, review the challenge as we do any other properly preserved claim." (Internal quotation marks omitted.) *State* v. *Padua*, 73 Conn. App. 386, 392, 808 A.2d 361 (2002), cert. granted on other grounds, 262 Conn. 941, 815 A.2d 672 (2003).

"In reviewing a sufficiency [of the evidence] claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom

the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"The evidence must be construed in a light most favorable to sustaining the jury's verdict. . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable. . . . [T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Abraham*, 64 Conn. App. 384, 400–401, 780 A.2d 223, cert. denied, 258 Conn. 917, 782 A.2d 1246 (2001).

"Under the statute establishing culpability for conspiracy, [a] person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . . Our Supreme Court has held that [t]o establish the crime of conspiracy under § 53a-48 . . . it must be shown that an agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . Further, the prosecution must show both that the conspirators intended to agree and that they intended to commit the elements of the under-

lying offense. . . . Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . [I]ntent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citation omitted; internal quotation marks omitted.) *State* v. *Miller*, 59 Conn. App. 406, 412–13, 757 A.2d 69 (2000), cert. denied, 255 Conn. 942, 769 A.2d 60 (2001).

We do not "sit as a [thirteenth] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility. . . . We are content to rely on the [jury's] good sense and judgment." (Citations omitted; internal quotation marks omitted.) *State* v. *Askew*, 55 Conn. App. 34, 42, 739 A.2d 274, cert. denied, 251 Conn. 918, 740 A.2d 866 (1999).

From the evidence presented at trial and the reasonable inferences that could be drawn therefrom, we conclude that there was sufficient evidence for the jury to find that the defendant had entered into an agreement with Concepcion to cause serious physical injury to another during the robbery. Although the defendant correctly states that " 'persons cannot attempt or conspire to commit an offense that requires an unintended result' "; *State* v. *Crosswell*, 223 Conn. 243, 263, 612 A.2d 1174 (1992); the jury heard from Concepcion that prior to entering the Fortune Chinese Restaurant, the defendant "cocked" his gun back, chambering a round. According to James Stephenson, a firearms and tool mark examiner at the forensic science laboratory with the department of public safety, when a round is chambered, it causes the firing mechanism to arm itself, enabling the gun to be fired once the trigger is pulled.

This case is unlike *State* v. *Crosswell*, supra, 223 Conn. 243, on which the defendant relies. In *Crosswell*, our Supreme Court determined that there was insufficient evidence to commit burglary in the first degree because the state had failed to prove that there was an agreement to inflict bodily injury on anyone. Id., 263. In *Crosswell*, the defendant and his accomplices had entered the victim's house with a gun to take $15,000. Id., 262. In this case, however, in addition to being armed with a gun and entering the Chinese Fortune Restaurant with Concepcion, the defendant had the gun chambered, ready for firing.

Construing the evidence in the light most favorable to sustaining the verdict, it was reasonable for the jury to find that the defendant and Concepcion had agreed, prior to entering the restaurant, to commit a serious physical injury to an individual during the robbery. Accordingly, there was sufficient evidence for the jury to find that the defendant was guilty of conspiracy to commit robbery in the first degree.

The judgment is affirmed.

In this opinion the other judges concurred.