STATE OF CONNECTICUT *v.* CHRISTOPHER
COLEMAN
(AC 23424)

Schaller, Bishop and McLachlan, Js.

Argued January 6—officially released July 6, 2004

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Frederick W. Fawcett*, supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Howard S. Stein*, assistant state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Christopher Coleman, appeals from the trial court's judgment of conviction, rendered after a jury trial, of two counts of tampering with a witness in violation of General Statutes § 53a-151. On appeal, the defendant claims that (1) § 53a-151 is unconstitutionally void for vagueness as applied to the facts of this case, (2) there was insufficient evidence to support the conviction, (3) the court improperly denied his first request for self-representation, (4) the court improperly concluded that his waiver of counsel was knowingly and intelligently made, (5) the court improperly denied his motion for a continuance, (6) the court improperly charged the jury on the elements of § 53a-151 and (7) the prosecutor's comments during cross-examination and closing argument were improper and amounted to misconduct sufficient to warrant a new trial. We affirm the judgment of the trial court.

The facts underlying the witness tampering conviction at issue in this appeal arise out of a 2001 jury trial (first trial) in which the defendant was charged with attempt to commit murder in connection with an April 5, 1999 shooting.[1] During the first trial, the defendant's

---

[1] The defendant also was charged with one count each of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B), assault in the first degree in violation of General Statutes § 53a-59 (a) (5), robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), conspiracy in violation of General Statutes § 53a-48 (a), criminal possession of a

girlfriend, Shaquanda McMichael, and her mother, Phyllis McMichael, testified for the defendant as alibi witnesses. Both testified that Shaquanda McMichael spent the entire day and evening in question with the defendant, including the time frame within which the shooting was alleged to have occurred. Based in part on that testimony, the defendant successfully argued that he could not have committed the shooting, and a mistrial was declared due to a hung jury.

It was discovered subsequently that the McMichaels allegedly had fabricated the defendant's alibi in the first trial and that the defendant allegedly had influenced them to do so. As a result, when the defendant was retried on the charge of attempt to commit murder, the state added two charges of witness tampering in connection with his alleged involvement in the false testimony provided by the McMichaels.[2] During the second trial, the McMichaels testified that the statements they made in the first trial establishing an alibi for the defendant were not truthful. Shaquanda McMichael explained that she had visited the defendant while he was incarcerated and awaiting the first trial and that during those visits, he told her that she should present an alibi that she was with him the entire day in question. She further testified that the defendant wrote her four letters from prison, detailing the false alibi she should provide and instructing her to give the letters to Phyllis McMichael after memorizing their contents. Shaquanda McMichael also testified that when she visited the defendant in prison, he questioned her on the content of the letters to test the accuracy of her recollection of the fabricated alibi. Phyllis McMichael similarly testified that she read the letters written by the defendant

firearm in violation of General Statutes § 53a-217 (a) and carrying a pistol without a permit in violation of General Statutes § 29-35 (a).

[2] The defendant also was retried on the other six charges stemming from the shooting, as set forth in footnote 1.

and that when she visited him in prison, he also tested her recollection of the details of the false alibi.

The defendant's former cell mate, Wilfredo Benitez, also testified at the second trial. Benitez testified that the defendant informed him that "he was telling his girlfriend and his girlfriend's mother what exactly to say to the investigators about his alibi, to say he wasn't at the crime scene. And he said he was writing from jail continuing to tell them that—continuing to tell them what to say through letters and stuff like that." On July 22, 2002, the jury returned a guilty verdict on both counts of witness tampering, and the court thereafter imposed a sentence of five years incarceration on each count, with the sentences to run concurrently.[3] This appeal followed.

I

The defendant first claims that § 53a-151 is unconstitutionally void for vagueness as applied to the facts of this case. We disagree.

The defendant did not raise that issue at trial and, thus, failed to preserve it properly for appeal. He now requests review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[4] We review his claim under *Golding* because the record is adequate for our review,

---

[3] The defendant was acquitted of the remaining charges. See footnotes 1 and 2.

[4] In *Golding*, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40. "The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review." (Internal quotation marks omitted.) *State* v. *Jordan*, 64 Conn. App. 143, 150, 781 A.2d 310 (2001).

and a claim that a statute is unconstitutionally vague implicates a defendant's fundamental due process right to fair warning.

The defendant argues that § 53a-151 is ambiguous as applied to him because it fails to provide adequate notice that his conduct in the present case was prohibited. The defendant specifically takes issue with the statutory phrase, "induces or attempts to induce a witness to testify falsely," which he contends implies that to violate the statute, one must bribe, threaten or coerce a witness into providing false testimony when that witness is reluctant to do so. The defendant argues, in that respect, that the statute does not fairly warn that its terms can be violated when a witness is willing to testify falsely at the outset, independent of any coercive influence.

A statute need not exhaustively list the exact conduct prohibited. A vagueness challenge can be surmounted if interpretations of the statute by our appellate courts elucidate the reach of the statute's prohibitions. See *Packer* v. *Board of Education*, 246 Conn. 89, 107, 717 A.2d 117 (1998). Any ambiguity claimed by the defendant in the phrase, "induces or attempts to induce," however, was resolved in *State* v. *Cavallo*, 200 Conn. 664, 513 A.2d 646 (1986), in which our Supreme Court expressly considered and rejected the notion that this phrase renders § 53a-151 void for vagueness. The court explained that "[t]he language of § 53a-151 plainly warns potential perpetrators that the statute applies to any conduct that is intended to prompt a witness to testify falsely . . . . The legislature's unqualified use of the word 'induce' clearly informs persons of ordinary intelligence that any conduct, whether it be physical or verbal, can potentially give rise to criminal liability. Although the statute does not expressly mandate that the perpetrator intend to cause the witness to alter or withhold his testimony, this implicit requirement is

apparent when the statute is read as a whole. . . . The legislature's choice of the verb 'induce' connotes a volitional component of the crime of tampering that would have been absent had it employed a more neutral verb such as 'cause.' Furthermore, the statute's application to unsuccessful, as well as successful, attempts to induce a witness to render false testimony supports our conclusion that *the statute focuses on the mental state of the perpetrator* to distinguish culpable conduct from innocent conduct." (Citations omitted; emphasis added.) Id., 668–69.

The clear import of that language is that the respective mental states of the McMichaels, i.e., their purported willingness to testify falsely, is irrelevant to whether the defendant's conduct falls within the statutory bounds of proscribed conduct. The Supreme Court made clear that liability under § 53a-151 hinges on the mental state of the perpetrator in engaging in the conduct at issue—his intent to induce a witness to testify falsely—not on whether he must overcome by coercive means the will of a witness reluctant to do so.

As the result of our Supreme Court's lucid explanation of the type of conduct prohibited under § 53a-151, there existed a judicial gloss with respect to the statute, of which the defendant must be presumed to have been aware,[5] to the effect that the statute can be violated even though a witness may be independently willing to provide false testimony. See *State* v. *Jason B.*, 248 Conn. 543, 568, 729 A.2d 760 (finding that prior decisions of our appellate courts construing General Statutes § 53-21 provided fair notice that sexual intercourse with child younger than sixteen was violative of statute), cert. denied, 528 U.S. 967, 120 S. Ct. 406, 145 L. Ed. 2d

---

[5] The Supreme Court's decision in *State* v. *Cavallo*, supra, 200 Conn. 664, was issued well before the conduct at issue in the present case was alleged to have occurred and, therefore, supports our finding of presumptive knowledge of the contents of § 53a-151.

316 (1999). We accordingly conclude that § 53a-151, as interpreted in our case law, provides fair warning of the conduct that it prohibits and is not void for vagueness as applied to the present case.

## II

The defendant next claims that the state produced insufficient evidence to sustain his conviction under § 53a-151. Specifically, the defendant argues that the state failed to prove that he induced or attempted to induce the McMichaels to testify falsely and that the evidence demonstrated instead that they did so willingly. We disagree.

Conceding that his claim is unpreserved, the defendant again requests review under *State* v. *Golding*, supra, 213 Conn. 239–40. We review his claim because any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right and is entitled to review whether or not the claim was preserved at trial. See *State* v. *Gentile*, 75 Conn. App. 839, 861, 818 A.2d 88, cert. denied, 263 Conn. 926, 823 A.2d 1218 (2003).

"In reviewing a claim of insufficiency of the evidence, this court construes the evidence in the light most favorable to sustaining the jury's verdict and will affirm that verdict if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . . The issue is whether the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Adams*, 225 Conn. 270, 276, 623 A.2d 42 (1993).

To convict a defendant under § 53a-151, the state must prove beyond a reasonable doubt, inter alia, that he "induce[d] or attempt[ed] to induce" a witness to testify falsely. The defendant argues that the state failed to produce sufficient evidence to prove that element

because there was testimony at trial that the McMichaels provided false testimony willingly and not as a result of any coercion by the defendant. As we explained in part I, liability under the statute does not turn on whether the witness was willing or unwilling to testify falsely, but on whether the defendant intended to induce the witness to testify falsely. See *State* v. *Cavallo*, supra, 200 Conn. 668–69; see also *State* v. *Higgins*, 74 Conn. App. 473, 488–89, 811 A.2d 765, cert. denied, 262 Conn. 950, 817 A.2d 110 (2003). The state, therefore, needed to prove only that in engaging in the conduct at issue, the defendant intended to induce the McMichaels to provide false testimony.

As it is virtually impossible to discern one's intent, absent an explicit declaration thereof, a person's state of mind usually is proven by circumstantial evidence. "Intent may be and usually is inferred from conduct. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Hill*, 58 Conn. App. 797, 804, 755 A.2d 919, cert. denied, 254 Conn. 936, 761 A.2d 763 (2000).

Applying those standards to the present case, we conclude that the evidence presented by the state, as previously set forth, could have persuaded the jury, beyond a reasonable doubt, that the defendant intended to induce the McMichaels to testify falsely.

III

The defendant next claims that the court improperly denied his first request for self-representation. We disagree.

On April 29, 2002, the day before the second trial commenced, the court heard the state's motion to con-

solidate the witness tampering charges with those for which the defendant was being retried in connection with the April 5, 1999 shooting. During that hearing, the defendant informed the court that he wanted to file a motion to discharge his attorney and to represent himself. The court, apparently under the impression that such motion already had been made and denied, responded, "I think this motion has been decided."[6] The court accordingly denied the defendant's request and adjourned the proceedings.

The next morning, prior to the commencement of jury selection, the court acknowledged that it had mistakenly denied the defendant's motion on the previous day. The court stated: "Mr. Coleman, yesterday I misspoke when I said your motion to represent yourself had been determined as part of the pretrial motions prior to the case—cases arriving in this courtroom for trial. So, we are going to revisit that motion." The court then held a hearing on the motion pursuant to *Faretta* v. *California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d

---

[6] The following colloquy occurred:

"The Court: Mr. Coleman, don't speak out like that again. I think this motion has been decided.

"[The Defendant]: I want to represent myself.

"The Court: Not at this point, Mr. Coleman.

"[The Defendant]: Your Honor, I'm requesting to represent myself.

"The Court: Mr. Coleman, I'm not going to argue with you. Your motion to represent yourself is denied.

"[The Defendant]: I have the right to represent myself.

"[The Marshal]: Quiet. Quiet. Quiet.

"[The Defendant]: I don't have the right to represent myself, Your Honor?

"The Court: That's right, Mr. Coleman, not at this point. It has progressed too far. We are into trial. [Defense counsel Wayne] Keency and . . . [defense] attorney [Sarah F.] Summons are going to—

"[The Defendant]: I'm being denied my constitutional rights.

"The Court: That's right—you're not being denied your constitutional rights. You are being denied the opportunity to represent yourself here. It has been denied.

"[The Defendant]: I'm willing to take it from this point on myself.

"The Court: No, no. That's the end of that."

562 (1975), and concluded that the defendant could represent himself, but that his attorneys would remain as standby counsel.[7] The defendant argues that notwithstanding the court's subsequent reconsideration and granting of the motion, the court's initial denial constituted a deprivation of his right to self-representation.

The defendant in a criminal trial has the right under the sixth amendment to waive counsel and to conduct his defense. See id. Beyond merely ensuring that trial outcomes are fair, the right to self-representation derives principally from interests in individual integrity, autonomy and self-expression. See id., 834. For a defendant in a criminal proceeding, it "encompasses certain specific rights to have his voice heard. The pro se defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." *McKaskle* v. *Wiggins*, 465 U.S. 168, 174, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984).

The defendant has failed to demonstrate that the court impeded his exercise of any of the aforementioned prerogatives afforded by the right to self-representation. Our review of the record discloses instead that the court's timely reconsideration and granting of the motion averted any impairment of those rights and provided the defendant the unimpeded ability to control his defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses and to address the court. See id. We conclude, therefore, that the defendant was not denied the right to self-representation.

IV

The defendant next claims that the court's canvass of him was inadequate to ascertain whether his waiver

---

[7] See *Faretta* v. *California*, supra, 422 U.S. 806 (requiring inquiry by court, defendant's waiver of counsel before defendant can represent himself).

of counsel was knowingly and intelligently made. Specifically, the defendant claims that the canvass failed to apprise him that if he were convicted of all the charges against him, he would face a maximum possible sentence of 125 years in prison, plus fines.[8] We disagree that the canvass was deficient.[9]

---

[8] Although the defendant challenges the canvass as to whether he was sufficiently informed to be able to make a knowing waiver with respect to other charges he faced, because he was convicted only of tampering with a witness, we will address his challenges only to the extent that they relate to the witness tampering charges.

[9] During the canvass, the following colloquy occurred:

"The Court: And you're aware of all the charges you're facing?

"[The Defendant]: Yes, yes.

"The Court: All right. For example, the first count in the first information, I'll be asking about charges of attempted murder. You're aware of that?

"[The Defendant]: Yes.

"The Court: You know the essential elements of murder?

"[The Defendant]: Yeah.

"The Court: You know what the state has to prove?

"[The Defendant]: Yes.

"The Court: What [does it] have to prove?

"[The Defendant]: It's in my General Statutes. I don't know offhand. I know the state has to prove I intentionally caused the death or attempted to cause the death of one individual, a human being.

"The Court: You know what attempt is?

"[The Defendant]: Mm-hmm.

"The Court: You know that is a separate section in the statutes?

"[The Defendant]: Yes.

"The Court: You're familiar with the statutes?

"[The Defendant]: Attempted to cause the physical harm or deformation of, you know.

"The Court: But are you familiar with the Connecticut General Statutes?

"[The Defendant]: Yes.

"The Court: You know where to find various things?

"[The Defendant]: Yes.

"The Court: All right. You know what the penalty is for attempted murder?

"[The Defendant]: Twenty years, I believe.

"The Court: What about kidnapping in the first degree?

"[The Defendant]: Maybe—I think twenty, maybe. Fifteen or twenty. I know that minimum is five, maximum is twenty; that is for attempted murder. I know them all, just—I know them.

"The Court: You know the elements of kidnapping and what the state has to prove?

"[The Defendant]: Removing somebody by force or with a weapon against their will, a certain amount of steps or something like that.

"The Court: All right. What about the third count, assault in the first degree?

"[The Defendant]: Assault with a deadly weapon, an instrument causing assault.

Conceding that his claim is unpreserved, the defendant again requests review under *State* v. *Golding,*

"The Court: You know what the state has to prove?

"[The Defendant]: Can I look in here? It's on—

"The Court: Pardon me?

"[The Defendant]: Can I look in my paperwork? It's on me.

"The Court: You have your own paperwork on all of these charges?

"[The Defendant]: I was given. I don't have that one. But I know. I'm fully competent, Your Honor.

"The Court: Well, you are telling me that, but you know we're going to start picking a jury today in this, and you don't know the answers to a number of these questions. . . . How about robbery in the first degree?

"[The Defendant]: Taking the possession—taking someone's belongings by force or with a weapon, yes, with a weapon or threaten, threat of harm.

"The Court: And how about carrying a pistol without a permit?

"[The Defendant]: Carrying a pistol without a—without a license within the city limits.

"The Court: Okay. You know the definitions of, like, a firearm? You know that is defined in the statutes? You know where to find it?

"[The Defendant]: As far a like [title] 53a, et cetera? You mean the numbers?

"The Court: Yes.

"[The Defendant]: Not offhand, but I find it.

"The Court: You can find it?

"[The Defendant]: Yes, definitely.

"The Court: How about criminal possession of a firearm?

"[The Defendant]: It's two charges, isn't it?

"The Court: Pardon me?

"[The Defendant]: Criminal possession is one, and firearm is another.

"The Court: It is one count, criminal possession of a firearm. It is the seventh count.

"[The Defendant]: That's being in possession of a firearm already having a previous conviction of a felony.

"The Court: All right. You know where to find that? Do you know how you are going to defend these charges? Have you thought about this?

"[The Defendant]: Somewhat, yes, yeah.

"The Court: What about the tampering charges? You know they were joined, tampering with a witness charges?

"[The Defendant]: Yeah, yes.

"[The Court]: You know where to find that in the statutes?

"[The Defendant]: Yes.

"The Court: Do you know what the state has to prove?

"[The Defendant]: That I caused or induced the false testimony of one person by persuasion, intimidation; like, saying either I talked them into it, forced them or conned them into it. I can't use the terminology offhand, but that's the three basis of tampering.

"The Court: You know what these charges are punishable by?

"[The Defendant]: Yeah, yes.

supra, 213 Conn. 239–40. We review his claim under *Golding* because the record is adequate for our review, and the defendant's right to counsel clearly is of constitutional magnitude.

"A defendant has knowingly and intelligently waived the right to counsel if the trial judge finds that he (1) [h]as been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled; (2) [p]ossesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself; (3) [c]omprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and (4) [h]as been made aware of the dangers .and disadvantages of self-representation." (Internal quotation marks omitted.) *State* v. *Bangulescu*, 80 Conn. App. 26, 42–43, 832 A.2d 1187, cert. denied, 267 Conn. 907, 840 A.2d 1171 (2003); see also Practice Book § 44-3.

"[T]he determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. . . . This important decision rests within the discretion of the trial judge. . . . Our task, therefore, is to determine whether the court abused its discretion in allowing the defendant to discharge his counsel and to represent himself." (Citation omitted; internal quotation marks omitted.) *State* v. *Bangulescu*, supra, 80 Conn. App. 43.

"The Court: All of them?

"[The Defendant]: Yes.

"The Court: You know all of these charges are very serious. You understand that?

"[The Defendant]: Yes, I do."

The defendant has not directed this court to any authority, nor do we know of any, mandating that a canvass must calculate the maximum possible sentence a defendant could face if convicted of all the charges against him. On the contrary, we have held that "[t]he rules of practice do not, as the defendant suggests, require the court to satisfy itself that the defendant has a *precise* understanding of the maximum sentence." (Emphasis in original.) *State* v. *Porter,* 76 Conn. App. 477, 502, 819 A.2d 909, cert. denied, 264 Conn. 910, 826 A.2d 181 (2003). Although the defendant in his brief cites numerous cases in which trial court canvasses advised defendants of the maximum possible sentence, in none of those cases did the reviewing court find that such calculation was a sine qua non to its determination that the canvass was sufficient. See *State* v. *Wolff,* 237 Conn. 633, 639 n.9, 678 A.2d 1369 (1996); *State* v. *Copp,* 54 Conn. App. 695, 700, 736 A.2d 941, cert. denied, 252 Conn. 901, 743 A.2d 615 (1999); *State* v. *Oliphant,* 47 Conn. App. 271, 273 n.2, 702 A.2d 1206 (1997), cert. denied, 244 Conn. 904, 714 A.2d 3 (1998).

The purpose of the canvass requirement is not to encumber the trial judge with the onerous task of engaging in a meticulously formulated dialogue about every conceivable facet of the state's case. We have instead found that a defendant's constitutional right is not violated "as long as the court's canvass, whatever its form, is sufficient to establish [in the court's opinion] that the defendant's waiver was voluntary and knowing. . . . In other words, the court may accept a waiver of the right to counsel . . . if the record is sufficient to establish that the waiver is voluntary and knowing." (Internal quotation marks omitted.) *State* v. *Bangulescu,* supra, 80 Conn. App. 43–44.

Our review of the record reveals that the court's canvass was sufficient to establish that the defendant's

waiver was knowing and voluntary. We accordingly conclude that the court's canvass was not deficient.

V

The defendant next claims that the court improperly denied his motion for a continuance. We disagree.

Conceding that his claim is unpreserved, the defendant again requests, and we afford, review under *State* v. *Golding*, supra, 213 Conn. 239–40, because the record is adequate for review, and the claim implicates the defendant's constitutional rights to self-representation and to present a defense.

"The determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . . A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . To prove an abuse of discretion, an appellant must show that the trial court's denial of a request for a continuance was arbitrary. . . . The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." (Internal quotation marks omitted.) *State* v. *Coney*, 266 Conn. 787, 801, 835 A.2d 977 (2003). "[I]f the reasons given for the continuance do not support any interference with the specific constitutional right, [this] court's analysis will revolve around whether the trial court abused its discretion." *In re Shaquanna M.*, 61 Conn. App. 592, 602, 767 A.2d 155 (2001).

The court held a *Faretta* hearing prior to jury selection and granted the defendant's motion for self-representation. During the *Faretta* hearing, the defendant asked the court for a continuance, stating that he needed time to "go over [his] paperwork." The court

denied that request and proceeded with voir dire, with the defendant acting as his own attorney. The defendant now argues that the court's denial of his motion for a continuance prevented him from being able to interview and to prepare witnesses, and therefore violated his rights to self-representation and to present a defense.

The trial transcript reveals that the defendant indicated that he needed time to "go over [his] paperwork," not that he needed time to interview or to prepare witnesses.[10] We are confined in our review of a court's denial of a motion for a continuance to those grounds raised in and considered by the trial court, and are precluded from considering the defendant's claim on the basis of a ground that was not articulated before the trial court. Confining our review of the denial of the motion to the ground raised in the trial court, we conclude that the court did not abuse its discretion. Faced with the imprecise explanation that the defendant merely sought time to go over paperwork, we cannot say that the court's denial was arbitrary or unreasonable.

We also note that "[t]he trial court has a responsibility to avoid unnecessary interruptions, to maintain the orderly procedure of the court docket, and to prevent any interference with the fair administration of justice." (Internal quotation marks omitted.) *State* v. *Stevenson*, 53 Conn. App. 551, 562, 733 A.2d 253, cert. denied, 250 Conn. 917, 734 A.2d 990 (1999). "Our judicial system cannot be controlled by the litigants and cases cannot be allowed to drift aimlessly through the system. . . . Judges must be firm and create the expectation that a case will go forward on the specific day that it is assigned." (Internal quotation marks omitted.) *State* v.

---

[10] Although later that day, the defendant informed the court that he needed to interview witnesses, he did not raise that reason in his motion for a continuance.

*Bradley*, 39 Conn. App. 82, 87–88, 663 A.2d 1100 (1995), cert. denied, 236 Conn. 901, 670 A.2d 322 (1996). For those reasons, we often have expressed our disfavor with motions for continuances that are filed on the eve of trial. See id., 88; see also *State* v. *Robinson*, 227 Conn. 711, 726, 631 A.2d 288 (1993).

The defendant advances several arguments in support of his claim that the court should have granted the motion. Principal among those is that because jury selection had not yet begun, there was no reason that the court would have been inconvenienced by the granting of a continuance. As a preliminary matter, "[t]he question of whether, and to what degree, a trial court is inconvenienced by a continuance can be answered only by the court itself." *State* v. *Bradley*, supra, 39 Conn. App. 87. "Moreover, whether jury selection had begun is not determinative of whether the court's denial of the continuance was [arbitrary]." Id., 88. We conclude, therefore, that the court did not abuse its discretion in denying the defendant's motion for a continuance.

## VI

The defendant next claims that the court improperly charged the jury on the elements of § 53a-151. Specifically, he argues that the court failed to instruct the jury on the element of intent. We disagree.

Conceding that his claim is unpreserved, the defendant again requests, and we afford, review under *State* v. *Golding*, supra, 213 Conn. 239–40, because the record is adequate for review, and a court's failure to instruct the jury on an essential element of a crime is of constitutional magnitude.

"[A] charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . .

[T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . We do not critically dissect the charge in order to discover possible inaccurate statements. . . . Rather, we see if [the jury instructions] gave the jury a reasonably clear comprehension of the issues presented for their determination . . . and were suited to guide the jury in the determination of those issues." (Internal quotation marks omitted.) *State* v. *Charles*, 78 Conn. App. 125, 128–29, 826 A.2d 1172, cert. denied, 266 Conn. 908, 832 A.2d 73 (2003).

The court instructed the jury in relevant part: "For you to find the defendant guilty of this charge, the state must prove . . . that the defendant induced or attempted to induce a witness to testify falsely. It should be noted that it is immaterial whether the defendant was successful in producing the result he intended. It is, however, sufficient if the defendant *knowingly* makes any false statements or practices any fraud or deceit *with the intent to affect the testimony* or conduct of a person who is a witness or who may be a witness at any official proceeding. If you find that the state has proven beyond a reasonable doubt each of the elements of the crime as to each count of tampering with a witness, then you shall find the defendant guilty as to each count." (Emphasis added.)

The defendant accurately observes that pursuant to our Supreme Court's interpretation of § 53a-151 in *State* v. *Cavallo*, supra, 200 Conn. 668, the intent requirement is implicit in a reading of the statute as a whole. We disagree, however, with the defendant's contention that the court's instruction failed to provide the jury with a clear comprehension of that element.[11]

---

[11] We note also that the defendant appears to argue that § 53a-151 is a specific intent crime requiring a separate instruction as to specific intent.

Our courts have consistently recognized that jury instructions are ill-suited to critical dissection and mechanical scrutiny of their component parts. See, e.g., *State* v. *Charles*, supra, 78 Conn. App. 128–29. Our review of a jury instruction, therefore, is not undertaken with a myopic insistence on precise explanations of legal principles, but rather with a broad expectation that the instruction fairly apprises the jury of the issues requiring resolution and guidance in that task.[12] The jury instruction given by the court was accurate in both its explanation of the legal issues and its provision of guidance as to how the jury should resolve those issues. The court specifically referenced the element of intent and accurately explained that intent to effect the testimony of a witness is the gravamen of the crime of witness tampering. We therefore conclude that the court properly charged the jury on the elements of § 53a-151.

## VII

The defendant last claims that the prosecutor's comments during cross-examination and closing argument were improper and amounted to misconduct sufficient to warrant a new trial. The defendant specifically claims that the prosecutor (1) expressed his personal opinion that the defendant was lying, and (2) asked the defendant to comment on the veracity of other witnesses' testimony and then highlighted the defendant's responses during closing argument. We disagree that the challenged comments, even if improper, rose to a level sufficient to warrant a new trial.

As the defendant fails to direct the court to any authority in support of that notion, we do not address that aspect of the claim.

[12] We note also that the instruction comports, virtually to the letter, with the model instruction found in R. Leuba & R. Fracasse, Connecticut Selected Jury Instructions Manual (1998) § 4.5. Although not itself dispositive of the adequacy of the court's instruction, that certainly is persuasive and a factor considered in our analysis.

Conceding that his claim is unpreserved, the defendant again seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. Our Supreme Court has recently held that it is not necessary for a defendant to seek review under the specific requirement of *Golding* in these circumstances. *State* v. *Stevenson*, 269 Conn. 563, 573–74, 849 A.2d 626 (2004). The court explained: "The reason for this is that the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). As we stated in that case: In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense counsel or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"Regardless of whether the defendant has objected to an incident of misconduct, a reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial. The application of the *Williams* factors, therefore, is identical to the third and fourth prongs of *Golding*, namely, whether the constitutional violation exists, and whether it was harmful. . . . Requiring the application of both *Williams* and *Golding*, therefore, would lead, as in fact has occurred in the present case, to confusion and duplication of effort." (Citations omitted; internal quotation

marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 573–74.

Where the defendant has asserted a colorable claim that the alleged misconduct was blatantly egregious or pervasive, we will review the claim. See *State* v. *Correa*, 241 Conn. 322, 357, 696 A.2d 944 (1997); see also *State* v. *Williams*, supra, 204 Conn. 537.

Thus, we engage in a two step analytical process. "The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial . . . ." *State* v. *Ceballos*, 266 Conn. 364, 381–82 n.29, 832 A.2d 14 (2003). We address separately each of the defendant's claims to determine, first, whether the particular conduct was improper and, second, whether the impropriety, if any, deprived the defendant of a fair trial.

## A

### Whether Prosecutor Improperly Injected Personal Opinion into Trial

The defendant claims that the prosecutor impermissibly expressed his personal opinion to the jury that the testimony of the defendant was not credible. We disagree that the prosecutor's comments amounted to an expression of personal opinion.

"It is well established that a prosecutor may not express her own opinion, either directly or indirectly, as to the credibility of a witness or the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony . . .

[and] are particularly difficult for the jury to ignore because of the special position held by the prosecutor." (Citations omitted; internal quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 304–305, 755 A.2d 868 (2000).

At trial, the defendant offered testimony to refute the allegation that he intended to cause Shaquanda McMichael to testify falsely. The defendant testified that he told his then attorney, Frank Riccio, Sr., not to call her to testify in the first trial and even argued with him about the matter when Riccio purportedly reprimanded him about not interfering with trial strategy.[13] After the defendant testified that he specifically instructed Riccio that he did not want Shaquanda McMichael called as a witness, the prosecutor stated: "Get me Riccio, right away." The defendant claims that this statement conveyed the prosecutor's personal opinion that the defendant was lying when he testified that he told Riccio not to call Shaquanda McMichael as a witness.

Although we disapprove of the prosecutor's sarcastic and gratuitous commentary, we do not agree that it amounted to an expression of his personal opinion and, more importantly, we find it unlikely that the jury interpreted the comment as such.[14] Therefore, we do not consider whether those inappropriate remarks consti-

---

[13] The following colloquy occurred:

"[The Prosecutor]: You begged Shaquanda [McMichael] not to testify in the first trial?

"[The Defendant]: Argued with her and even argued with Riccio about it. He told me it's his case, and he handles it himself. You don't tell a surgeon how to cut his patient. His exact words.

"[The Prosecutor]: You argued—you told Mr. Riccio that you didn't want Shaquanda [McMichael] called at the first case?

"[The Defendant]: Shaquanda [McMichael], Phyllis [McMichael] or Joey. Joey was the only one he agreed with me on.

"[The Prosecutor]: You told Riccio you didn't want Shaquanda [McMichael] called on the first case? Get me Riccio, right away."

[14] To the extent that the prosecutor's sarcasm may have resonated with the jury, the court immediately chastised the prosecutor in front of the jury.

tuted misconduct that could have deprived the defendant of a fair trial.

B

Whether Prosecutor Improperly Asked Defendant to
Comment on Veracity of Witnesses' Testimony

The defendant next claims that the prosecutor improperly posed questions that required the defendant to characterize the veracity of several witnesses, including the McMichaels and Benitez. The defendant claims also that the misconduct was exacerbated when, during closing argument, the prosecutor emphasized the defendant's characterizations of the witnesses' testimony. Although we agree that some of the prosecutor's questions were improper, we disagree that the misconduct caused substantial prejudice or undermined the fairness of the trial.

In *State* v. *Singh*, 259 Conn. 693, 706, 793 A.2d 226 (2002), our Supreme Court adopted the evidentiary rule, already firmly established in other jurisdictions, that it is improper to ask a witness to comment on another witness' veracity. The court accordingly prohibited a prosecutor from posing questions that compel a defendant, in response to such questions, to make credibility determinations of the witnesses or to assess the veracity of their testimony. See id.

After reviewing the relevant transcript, we conclude that the prosecutor's line of questioning clearly sought to elicit from the defendant responses characterizing the veracity of the witnesses who testified against him. On cross-examination, the prosecutor questioned the defendant about Shaquanda McMichael's testimony at the first trial:

"[The Prosecutor]: So, you were here when Shaquanda [McMichael] testified, were you not?

"[The Defendant]: Yes.

"[The Prosecutor]: So, everything that Shaquanda [McMichael] said that happened on August 21 of 1999, that was the truth, wasn't it?

"[The Defendant]: Some of it. She want her kid. What you think she gonna do?

\* \* \*

"[The Prosecutor]: So, when Shaquanda [McMichael] testified that you were—that she hid you in the closet that day, that was the truth? Yes or no.

"[The Defendant]: Yeah."

Later, the prosecutor questioned the defendant about Benitez' testimony. In response to a question as to where Benitez could have obtained certain information about which Benitez had testified, the defendant responded: "He was lying." The following colloquy, in relevant part, then occurred:

"[The Prosecutor]: So, let me get this right . . . . Every one is lying against you?

"[The Defendant]: Yeah.

"[The Prosecutor]: Everybody?

"[The Defendant]: Yes.

"[The Prosecutor]: Shaquanda [McMichael]?

"[The Defendant]: Yes.

"[The Prosecutor]: Phyllis [McMichael]?

"[The Defendant]: Yes. . . .

"[The Prosecutor]: Wilfredo Benitez?

\* \* \*

"[The Defendant]: Definitely.

"[The Prosecutor]: All these people are lying against you?

"[The Defendant]: Yes . . . ."

During closing argument, the prosecutor stated in relevant part: "[The defendant] basically has told you from the [witness] stand that . . . Shaquanda McMichael is a liar. Phyllis McMichael is a liar. Wilfredo Benitez is a liar. . . . That all of these people have basically come in and that they've lied on him. What I would say to you at this point, ladies and gentlemen, is, isn't it funny, isn't it funny, that the only person who has got a vested interest in this case, and that is [the defendant], that the only person with a vested interest in this case and therefore a motive not to tell the truth, that he's the person who is now standing here and saying that everyone else is lying against him? Isn't that an interesting fact, [the defendant] calling everyone else a liar?"

That is precisely the type of conduct admonished in *Singh*. The prosecutor's questions sought to compel the defendant to characterize other witnesses as liars or their testimony as lies. Although, as a general matter, prosecutors are afforded generous latitude in argument, we have circumscribed that latitude with the limitation that the defendant's rights must not be compromised in the process. See, e.g., *State* v. *Morgan*, 70 Conn. App. 255, 289–90, 797 A.2d 616, cert. denied, 261 Conn. 919, 806 A.2d 1056 (2002). The line of questioning at issue in the present case clearly was improper under the rule articulated in *Singh* because it impermissibly invaded the province of the jury to determine issues of witness credibility and because such questioning suggested to the jury that inconsistencies between the testimony of witnesses can be explained only by deliberate misrepre-

sentation when, in fact, testimony may be in conflict for other reasons. See *State* v. *Singh*, supra, 259 Conn. 710.

We now turn to the ultimate question in a prosecutorial misconduct claim, namely, "whether the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) Id., 723.

It is well established that "[i]n determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, [our Supreme Court], in conformity with courts in other jurisdictions, has focused on several factors. . . . [Among them] are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) Id., 700–701. Those factors are not exhaustive and do not serve as a rigid checklist for the level of prejudice flowing from misconduct. Rather, the essential inquiry that guides our analysis is whether the defendant suffered substantial prejudice. See *State* v. *Pereira*, 72 Conn. App. 545, 563, 805 A.2d 787 (2002), cert. denied, 262 Conn. 931, 815 A.2d 135 (2003).

We conclude that in the context of the entire trial, the instances of improper questioning did not cause substantial prejudice or undermine the fairness of the trial. As the quoted excerpts demonstrate, the instances of misconduct were not sufficiently severe or numerous to form a pattern of egregious misconduct throughout the trial that would deprive the defendant of his fundamental right. As our Supreme Court recently pointed out, "*Golding* review of prosecutorial misconduct

claims is not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address gross prosecutorial improprieties that clearly have deprived a criminal defendant of his right to a fair trial." (Internal quotation marks omitted.) *State* v. *Ceballos,* supra, 266 Conn. 414–15.

Furthermore, "whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any of the prosecutor's improper remarks." *State* v. *Reynolds,* 264 Conn. 1, 165, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). Thus, in the same manner that a timely objection by defense counsel to the claimed improper remarks might strengthen a claim that the jury also may have perceived them in a prejudicial light, the failure of defense counsel to object may indicate that he did not perceive the remarks in the prejudicial light claimed on appeal.

Although the defendant did not request a specific curative instruction, the court gave the jury a clear explanation of the law that would have ameliorated any potential adverse effects of the prosecutor's misconduct. The court explicitly instructed the jurors that the issue of witness credibility was solely within their province.[15] In the absence of evidence to the contrary, we presume that the jury properly followed those instruc-

---

[15] The court instructed the jury in relevant part: "In deciding what the facts are, you must consider all the evidence. In doing this, you must decide which testimony to believe and which testimony not to believe. You may believe all, none or part of any witness' testimony. That is up to you. . . . Whether you credit a witness' testimony in whole or in part or not at all, it is solely for you, the jury, to determine using your experience, knowledge of human nature, common sense and awareness of the motives which influence and control human behavior. In deciding whether or not to believe a witness, keep in mind the fact that people sometimes forget things. You need to consider, therefore, whether an apparent contradiction is an innocent lapse of memory or an intentional falsehood, and that may depend on whether this has to do with an important fact or only a small detail."

tions. See *State* v. *Kirsch,* 263 Conn. 390, 416, 820 A.2d 236 (2003). Accordingly, we conclude that the challenged comments, although improper, did not rise to the magnitude of constitutional error sufficiently egregious to have deprived the defendant of a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.